IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH ASKEW                    :        CIVIL ACTION
                                :
         v.                     :
                                :
THE TRUSTEES OF THE GENERAL     :
ASSEMBLY OF THE CHURCH OF THE   :
LORD JESUS CHRIST OF THE        :
APOSTOLIC FAITH, INC., et al.   :        No. 09-15

MEMORANDUM

Dalzell, J.                                    July 21, 2009

        Plaintiff Joseph Askew here asserts various claims

based on allegedly improper dealings in the management of The

Trustees of the General Assembly of the Church of the Lord Jesus

Christ of the Apostolic Faith, Inc. ("Corporation"), a

Pennsylvania non-profit corporation that manages the business of

the General Assembly of the Church of the Lord Jesus Christ of

the Apostolic Faith ("Church"), an unincorporated association.

The church complex is located at 22nd and Bainbridge Streets in

Philadelphia.

        Defendants[1] jointly move under Fed. R. Civ. P. 12(b)(1)

_____

        [1]The defendants are (1) the Corporation, (2) Kenneth
Shelton, the head of the Church and the Corporation's President,
(3) John Carlton Thomas, the Corporation's Chief Administrator,
(4) Johnny Ray Brown, the Corporation's General Counsel and a
trustee, (5)-(7) trustees Anthony Lamb, James Henry Brown, and
Erik Shelton, and (8)-(10) Mary Thomas, Mrs. Johnny Ray Brown,
and Donna Shelton, who the plaintiff describes as a "constructive

to dismiss this case for lack of subject matter jurisdiction.
For the reasons detailed below, we shall grant defendants' motion
in part and deny it in part.

## I.    **Factual Background**

Bishop Sherrod C. Johnson founded the Church in 1919.
Compl. ¶ 22; Def.'s Mem. Ex. B, <u>Church of the Lord Jesus Christ
of the Apostolic Faith, Inc. v. Shelton</u>, No. 376 C.D. 2000, at 2
(Pa. Commw. Ct. April 10, 2001).  On December 10, 1947, Bishop
Johnson and other Church elders created a Pennsylvania non-profit
corporation to conduct business on behalf of the Church and hold
its assets.  Compl. ¶ 23(I)[2].

The Corporation's Articles of Incorporation provide
that it was formed "[t]o take, receive, have, hold and manage
real and personal property in trust for the use and purpose
specified by the [Church]."  <u>Id.</u> ¶ 24(I), Ex. B, Art. III.  The
Articles excluded "[p]ecuiary gain or profit, incidental or
otherwise, to it's [<u>sic</u>] members" from the realm of contemplated

_____

trustee[s] by virtue of possession of property both real and
personal that was acquired with misappropriated and stolen
funds."  Compl. ¶¶ 2-14.

[2]The complaint is misnumbered, repeating ¶¶ 23-25.  To
differentiate this duplication, we put a (I) after the first
instance of the paragraph and a (II) after the second.

purposes.  Id. ¶ 25(I), Ex. B, Art. III.   The Corporation was organized on a non-stock basis and initially had a six-member Board of Trustees who were vested with the authority to manage the assets.  Id. Ex. B, Art. VI, VII.   The Church elects its Trustees "at annual, regular or special meetings", and they hold office until successor Trustees are elected.  Id. Ex. B, Art. VI. Power to create and change the By-Laws and to amend the Articles vests in the Corporation's members.  Id. Ex. B, Art. X, XI.   The Articles limit membership in the Corporation to "those persons serving as members of the Board of Trustees."  Compl. Ex. B, Art. IX.

The By-Laws of the Church provide for an annual meeting, called the General Assembly.  Id. Ex. C, Art. I, Sec. 1. The General Assembly has two officers, a General Overseer (also called the General Elder, Apostle, or Bishop), and a General Secretary.  Id. Ex. C, Art I, Sec. 2.  The General Overseer is elected to a lifetime appointment by the General Assembly. Compl. ¶ 25(II); Def.'s Mem. Ex. B, Shelton, No. 376 C.D. 2000, at 2.  The General Overseer nominates the General Secretary for terms of one year, and the General Assembly vote to ratify the choice.  Compl. Ex. C, Art. VII.  The By-laws of the Church also provide that the Corporation holds title to any asset the Church

acquires.  Id. at 23(II), Ex. C, Art. II, Sec. 2.  The General
Overseer is also the President of the Corporation, and only those
the General Overseer authorizes can stand for election as the
Corporation's Trustees.  Id. ¶ 25(II), Ex. C, Art. II, Sec. 1.

On February 22, 1961, Bishop Johnson died and then-
General Secretary S. McDowell Shelton succeeded him.  Id. ¶ 26.
Bishop Shelton died on October 13, 1991.  Id. ¶ 27.  A succession
crisis ensued.

Kenneth Shelton, Roddy J. Shelton, and Anthonee
Patterson each claimed he had rightful control over the Church
and the Corporation.  Def.'s Mem. Ex. B, Shelton, No. 376 C.D.
2000, at 4.  Roddy Shelton was the General Secretary at the time,
and according to the By-laws of the Church should have succeeded
Bishop Shelton as interim General Overseer until the next General
Assembly.  Id. at 5-6, 14-15.  But some of the other Trustees
disputed Roddy Shelton's succession, and prevented him from
taking office.  Compl. Ex. A at 149.  Askew alleges that Kenneth
Shelton through threats and the use of physical force took de
facto control of both Church and Corporation.  Compl. ¶¶ 19, 29.
Askew avers that Kenneth Shelton and his followers physically
removed Askew and others in the Roddy Shelton faction from a

4

Church meeting held on May 23, 1992. Id. ¶ 19, Ex. A at 150.
Although he was removed from the property, Askew maintains that
he remains a member of the Church to this day. Id. ¶ 19.

The continuing dispute over leadership led the factions
to hold separate meetings, each styled as a General Assembly, and
each electing a different General Overseer. Id. Ex. A at 150.
Litigation ensued, starting a Dickensian legal saga of which this
case is only the most recent skirmish. The Philadelphia Court of
Common Pleas ultimately determined, and the Commonwealth Court
later affirmed, that Kenneth Shelton was duly elected General
Overseer at the September 9, 1992 General Assembly. Id. at 151;
Def.'s Mem. Ex. B, Shelton, No. 376 C.D. 2000, at 25. But the
parties have continued to play out their schism in the courts.
E.g., Def.'s Mem. Ex. C, Patterson v. Shelton, No. 1967 C.D. 2006
(Pa. Commw. Ct. January 31, 2008) (overturning arbitration award
in Patterson's favor because the arbitrator went beyond the scope
of his authority in fashioning relief).

Askew alleges that since taking control of the Church
and Corporation, Kenneth Shelton and the Trustees of the
Corporation have misappropriated funds, wasted assets, paid
themselves salaries and stipends that are contrary to the word
and spirit of the Articles and By-Laws, funded private

expenditures with Corporation assets, and violated state and federal law.  Compl. ¶¶ 31-38.

Askew sues the defendants both on his own behalf and on behalf of the Church for breach of fiduciary duty to both the Church and the Corporation (Counts I & II, respectively).  He also seeks a declaratory judgment that the Articles of Incorporation are unlawful under Pennsylvania's Nonprofit Corporation Law of 1988 ("NCL"), 15 Pa. C.S.A. § 5101, et seq., and that the Corporation must recognize members of the Church as members of the Corporation (Count III).  He seeks financial statements pursuant 15 Pa. C.S.A. § 5553 (Count IV), removal of Kenneth Shelton as President of the Corporation and appointment of a custodian pursuant 15 Pa. C.S.A. §§ 5764(a)(2) and 5981(2) (Count V), and unjust enrichment (Count VI).[3]  The Corporation is a nominal defendant in this action and no damages are sought

_____

[3]The Complaint also asserts claims for "Civil Conspiracy" (Count VII) and "Constructive Trust" (Count VIII).  Under Pennsylvania law, civil conspiracy is a separate cause of action that requires the plaintiff to establish a predicate tort. Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. Ct. 2008).  A constructive trust is a type of equitable remedy that courts impose when the plaintiff establishes certain types of unjust enrichment.  Makozy v. Makozy, 874 A.2d 1160, 1168-69 (Pa. Super. Ct. 2005). Since both the civil conspiracy claim and a request to impose a constructive trust are conditioned on the plaintiff establishing a separate claim, we will not now consider them.

directly from it.

Defendants have moved to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(1) arguing that we do not have subject matter jurisdiction over this action.  Defendants contend that the plaintiff lacks standing and that the First Amendment divests this Court of subject matter jurisdiction because Askew's claims involve doctrinal questions.

**II.  Analysis**

A court must dismiss a complaint if it lacks subject matter jurisdiction over the claims because without subject matter jurisdiction the court does not have the power to hear the case.  Fed. R. Civ. P. 12(b)(1); Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  Indeed, because subject matter jurisdiction is so central to a court's authority, a court can raise issues of subject matter jurisdiction sua sponte at any time.  Fed. R. Civ. P. 12(h)(3).

Challenges to subject matter jurisdiction may be facial or factual.  Mortensen, 549 F.2d at 891.  The former proceeds like a motion under Rule 12(b)(6), where the court accepts the allegations in the complaint as true.  Id.  In the latter, the court is "free to weigh the evidence and satisfy itself as to the

existence of its power to hear the case." Id.

Defendants proffer three different contentions in what plaintiff alleges to be this diversity case.[4]  First, defendants contend that the First Amendment's rule of deference to the determinations of religious organizations regarding their internal governance, customs, and discipline divests us of jurisdiction. Second, they argue that Askew lacks standing because he is not a member of the Church.  Lastly, they claim that he lacks standing under the NCL to bring derivative claims.

We will first consider the statutory standing arguments based on the NCL, then turn to defendants' constitutional standing arguments, and, finally, consider the First Amendment issues.

A.    **Standing Under The NCL**

Neither Askew nor the defendants are particularly clear as to what claims here are brought derivatively or derivative to what organization.  Two different organizations are involved here, and though they are related they are not the same.  There is the Church, an unincorporated association that has various By-Laws we discussed above.  The Church is not a corporation, and,

_____

[4] Askew claims to be a citizen of Maryland.

8

therefore, is not subject to the NCL.  There is also the Corporation, whose primary purpose is to hold property in trust for the Church.  The Corporation, alleged to be incorporated in Pennsylvania in 1947, is subject to the NCL.

Under Pennsylvania law, only certain classes of plaintiff have statutory standing to assert derivative suits on behalf of a nonprofit corporation.  15 Pa. C.S.A. § 5782.  When a legislature creates a statutory cause of action, it may limit who can bring such an action by limiting standing to sue.  See <u>Graden v. Conexant Systems, Inc.</u>, 496 F.3d 291, 295 (3d Cir. 2007).  Determining whether a particular individual has "statutory standing is simply statutory interpretation: the question it asks is whether [the legislature] has accorded <u>this</u> injured plaintiff the right to sue the defendant to redress his injury."  <u>Id.</u> (emphasis in original).  To that end, we "look first at the text of the statute and then, if ambiguous, to other indicia of [legislative] intent such as the legislative history."  <u>Id.</u>

The statutes in question here are not ambiguous.  Only an officer, director, or member of a nonprofit corporation has statutory standing to enforce a right of the nonprofit corporation through a derivative action.  15 Pa. C.S.A. § 5782.

A member of the corporation is defined as "one having membership rights in a corporation."  Id. § 5103.

The Corporation's Articles of Incorporation specifically state that its only members are its Trustees, and, thus, any claim that is derivative of the Corporation's rights can only be asserted by its directors or officers.  Askew does not claim to be a member of the Corporation, only that he is a member of the Church.  But membership in the Church is not the same as membership in the Corporation.  The two are different juridical entities.  Askew, therefore, does not have standing to bring any claims that are derivative of the Corporation's rights or otherwise can only be brought by an officer, director, or member of the Corporation.

Count II is a derivative claim.  In it, Askew alleges breach of fiduciary duty to the Corporation by its directors and officers.  The failure of these individuals to satisfy their duties of loyalty and care owed to the nonprofit corporation injures only that corporation.  Id. § 5717.[5]  Any right to

---

[5]Section 5717 states,

The duty of the board of directors, committees of the board and individual directors under section 5712 (relating to standard of care and justifiable reliance) is solely to the nonprofit corporation and may be

redress belongs to the Corporation and enforcement of such a
right is a classic derivative claim.   Id.   As such, Count II must
be dismissed.

Count IV is also a derivative claim.   Pursuant to 15
Pa. C.S.A. § 5553, the Board of Directors must present the
members with an annual report containing specific financial
information that is certified by the President and Treasurer, or,
if the corporation has no members, the President and Treasurer
must present the annual report to the Board.   No one other than
the membership or the Board of the Corporation is entitled to
this annual report.   Section 5553 forces the relevant officers to
make an accounting of the corporation's status to its Board or
members, and thereby provides nonprofit corporations with a right
to self-knowledge.   Any right that Section 5553 may confer is a
right of the corporation, and a claim to enforce this section
necessarily falls within the ambit of Section 5782.
Alternatively, any right Section 5553 creates could only belong
to the members of the nonprofit corporation or to the Board of
Directors because these are the only two groups that are entitled

_____

enforced directly by the corporation or may be enforced
by a member, as such, by an action in the right of the
corporation, and may not be enforced directly by a
member or by any other person or group.

under the statute to receive the annual report.  Since Askew has
no standing to bring a derivative claim and is not a member or a
director of the Corporation, Count IV must also fail.

Count V asserts a claim that only a member or director
of a nonprofit corporation can bring.  Count V seeks to remove
Kenneth Shelton as President of the Corporation pursuant to 15
Pa. C.S.A. § 5726 and appoint a custodian under 15 Pa. C.S.A. §§
5764, 5981(2).  Compl. ¶¶ 62-63.  But under 15 Pa. C.S.A. § 5726,
only the members, the board, or a court may remove a director.  A
court is only empowered to remove a director "upon petition of
any member or director".  15 Pa. C.S.A. § 5726(c).  Similarly,
courts are only empowered to appoint a custodian for a nonprofit
corporation "upon application of any member."  Id. § 5764(a).
Since Askew is not a member or director of the Corporation he is
not entitled to seek this kind of relief.  Therefore, Count V,
too, must be dismissed.

The remainder of the claims are not derivative claims
of the Corporation or claims that only the Corporation's members,
directors, or officers can bring.[6]  In Count I, Askew asserts a

_____

[6]Since the remaining claims are not derivative of the
Corporation's rights, and such claims have been dismissed, we
need not address the question of whether Askew has sufficiently
pled demand to the Corporation (or its futility).  Defendants do

claim of breach of fiduciary duty to the Church.  In Count III, he seeks on behalf of the Church and its membership to amend the Articles of Incorporation to transform the members of the Church into members of the Corporation.  In Count VI, he asserts a claim for unjust enrichment for the misappropriation of Church funds by the directors of the Corporation.

None of these claims belongs to the Corporation. Instead, they derive from Askew's membership in the Church and from the supposed trust relationship that exists between the Church and the Corporation.

### B.   <u>Constitutional Standing</u>

Askew's standing to bring Counts I, III, and VI depends on his membership in the Church.  To establish constitutional standing, a plaintiff must show "injury in fact (a concrete harm suffered by the plaintiff that is actual or imminent), causation, and redressibility."  <u>Doe v. Nat'l Bd. of Med. Examiners</u>, 199 F.3d 146, 152 (3d Cir. 1999) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).  Defendants argue that Askew has no standing to bring these claims because he is not a member

---

not argue, and, therefore, we do not address, whether Askew has satisfied the demand requirement as to the Church.

of the Church.  Only through Askew's membership in the Church is
he qualified to bring a derivative action on behalf of the
Church.  See, e.g., Fed. R. Civ. P. 23.1.  Without Church
membership, Askew would not be part of the beneficiary class for
which the Corporation holds its assets in trust.  Other than the
Corporation and the Church, only this class suffers injury when
the Corporation's assets are misused.

Defendants contend that Askew cannot be a member of the
Church because he admits that Kenneth Shelton and his faction
physically removed Askew on May 23, 1992.  Compl. ¶ 19, Ex. A at
150.  But Askew avers that he has been and remains a member of
the Church, and that his physical removal from the Church
premises did not constitute removal from Church membership.
Compl. ¶¶ 1, 19.

We treat defendants' Rule 12(b)(1) motion as a facial,
rather than a factual, challenge to Askew's standing because they
rely solely on Askew's own averments, and, therefore, we must
accept as true Askew's claim of Church membership.  See
Mortensen, 549 F.2d at 891.  Defendants do not present any
evidence to establish that Askew ceased being a member of the
Church, or that his physical removal amounts to excommunication
from the Church, or that some Church authority has declared that

Askew is no longer a member of the Church.  Since Askew alleges

that he remains a member of the Church, and the defendants do not

contest that averment with a proffer of contrary evidence, we

must at this juncture accept Askew's allegations as true.  <u>Id.</u>

Since Askew has averred membership in the Church, he has

therefore suffered an injury-in-fact and has standing to bring

these claims.[7]

### C.   <u>First Amendment</u>

Defendants argue the First Amendment's rule of

deference -- <u>i.e.</u>, that civil courts under the Free Exercise and

Establishment Clauses should not entangle themselves with the

internal workings and doctrines of religious organizations --

prevents us from hearing any of Askew's claims.

This rule of deference was first enunciated in <u>Watson</u>

<u>v. Jones</u>, 80 U.S. (13 Wall.) 679 (1871), which involved a

property dispute between pro- and anti-slavery factions of the

---

[7]We note that the plaintiff's burden to show standing is a
continuing one.  "Each element of standing must be supported in
the same way as any other matter on which the plaintiff bears the
burden of proof, <u>i.e.</u> with the manner and degree of evidence
required at the successive stages of litigation." <u>Doe</u>, 199 F.3d
at 152-53 (quoting <u>Lujan</u>, 504 U.S. at 561).  Thus, our ruling
today does not insulate Askew from continued scrutiny about his
membership in the Church, which we expect will be a subject for
discovery.

Presbyterian Church in post-Civil War Kentucky.  An intermediate
church authority declared that the pro-slavery minority was the
true church body and the rightful titleholder to the property.
But the highest church authority reversed the intermediate
authority's ruling, and declared the anti-slavery majority to be
the true church.  The pro-slavery minority filed suit in the
Chancery Court of Louisville and asked that court to determine
which faction was the true church, and thus the true titleholder.

      <u>Watson</u> held that civil courts <u>are</u> capable of resolving
property disputes involving religious organizations or bodies
within such organizations and "the rights of such bodies to the
use of the property must be determined by the ordinary principles
which govern voluntary associations; if the church had always
governed itself by majority rule, for example, the majority
faction would prevail."  <u>Scotts African Union Methodist</u>
<u>Protestant Church v. Conference of African Union First Colored</u>
<u>Methodist Protestant Church</u>, 98 F.3d 78, 86-87 (3d Cir. 1996)
(quoting <u>Watson</u>, 80 U.S. at 725) (internal quotations omitted)).
<u>But</u> the courts' capacity to adjudicate such disputes has limits:
"whenever the question of discipline, or of faith, or
ecclesiastical rule, custom, or law have been decided by the
highest of these church judicatories...legal tribunals must

accept such decisions as final, and as binding on them." <u>Watson</u>,
80 U.S. at 727.

Later courts have further refined this rule of
deference and given it explicit First Amendment footing.  <u>See,
e.g., Gonzalez v. Roman Catholic Archbishop</u>, 280 U.S. 1, 16
(1929) ("the decisions of the proper church tribunals on matters
purely ecclesiastical, although affecting civil rights, are
accepted in litigation before the secular courts as conclusive");
<u>Kedroff v. Saint Nicholas Cathedral</u>, 344 U.S. 94, 120-21 ("in
those cases when the property right follows as an incident from
decisions of the church custom or law on ecclesiastical issues,
the church rule controls"); <u>Serbian Eastern Orthodox Diocese for
the United States and Canada v. Milivojevich</u>, 426 U.S. 696, 709
(1976) ("where resolution of the disputes cannot be made without
extensive inquiry by civil courts into religious law and polity,
the First and Fourteenth Amendments mandate that civil courts
shall not disturb the decisions of the highest ecclesiastical
tribunal within a church of hierarchical polity").

But this is not the only strand in the jurisprudence
the Supreme Court has developed.  Another line of cases establish
what is known as the "neutral principles" doctrine, <u>i.e.</u>, that
civil courts may resolve intrachurch property disputes that are

amenable to the application of neutral principles of law.
Presbyterian Church in the United States v. Mary Elizabeth Blue
Hull Memorial Presbyterian Church, 393 U.S. 440, 449 (1969).

In Mary Elizabeth Blue Hull, two Presbyterian churches
in Georgia decided to withdraw from the national church, and both
filed suit against the national church to quiet title to property
the local churches held.  Id. at 441.  The Georgia courts decided
that the local churches held the property in trust for the
national church, but only if the national church adhered to the
original tenets and doctrines of the local churches at the time
of their founding.  Id.  The Supreme Court overturned the jury's
decision in favor of the local churches because "First Amendment
values [were] plainly jeopardized when church property litigation
is made to turn on the resolution by civil courts of
controversies over religious doctrine and practice."  Id. at 449.
But it also stated that "[c]ivil courts do not inhibit free
exercise of religion merely by opening their doors to disputes
involving church property.  And there are neutral principles of
law, developed for use in all property disputes, which can be
applied without 'establishing' churches to which property is
awarded."  Id.  Since Mary Elizabeth Blue Hull, the Supreme Court
has firmly established that the First Amendment does not prohibit

18

civil courts from resolving property disputes to which only neutral principles of law apply.  <u>Jones v. Wolf</u>, 443 U.S. 595, 603 (1979).

Jones v. Wolf involved yet another property dispute between Presbyterian churches in Georgia.  A majority of the Vineville Presbyterian Church of Macon, Georgia had decided to leave the Presbyterian Church in the United States and join the Presbyterian Church in America.  <u>Id.</u> at 598-99.  But the Augusta-Macon Presbytery -- the church authority directly above the local congregation -- determined that the minority faction was the true congregation.  <u>Id.</u>  With this ruling in hand, the minority sued in state court to quiet title to the local church's property. <u>Id.</u>  The Georgia courts had adopted a neutral principles approach and determined that the property was vested in the local congregation, and nothing in state law nor the constitution of the general church created a trust in favor of the general church.  <u>Id.</u> at 599.  Therefore, the court ruled in favor of the majority faction.  <u>Id.</u>

The Supreme Court affirmed the state court's use of neutral principles to determine title despite the Augusta-Macon Presbytery's decision that the minority faction was the true congregation.  States did not have to adopt a compulsory

19

deference approach.  Id. at 605-06.  The Supreme Court also found it constitutional for courts employing the neutral principles approach to "examine certain religious documents, such as a church constitution...[but to] take special care to scrutinize the document in purely secular terms, and to not rely on religious precepts."  Id. at 604.  The Supreme Court generally lauded the neutral principles approach as "completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity."  Id. at 603.  This approach relied "exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges...thereby promis[ing] to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice".  Id.

Even the Supreme Court's reason for remand was based on this neutral principles approach.  The state court had applied a majority rule to hold that title vested with the majority faction of the local congregation without explicitly giving a reason for applying such a rule.  Id. at 607-08.  The Supreme Court remanded to the state courts so they could determine whether church documents or state law indeed justified applying the majority rule, or if the law or charter provided a different way of determining the identity of the local church.  Id. at 608-09.

20

States are free to choose which approach they wish to take.  Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 367-68 (1970) (Brennan, J., concurring).  Sharpsburg was a per curiam decision affirming a court's application of neutral principles of trust and property law to an intrachurch property dispute.  Justice Brennan wrote in concurrence to clarify that "a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith."  Id. (emphasis in original).  States could adopt a complete deference approach, or a neutral principles approach, or something in between.  Id. at 368-69.  Regardless of the approach adopted, there was a line courts could not cross: "general principles of property law may not be relied upon if their application requires civil courts to resolve doctrinal issues." Id. at 370.

A district court sitting in diversity on a matter involving an intrachurch property dispute must determine what approach the state has endorsed in dealing with such matters. Scotts African Union, 98 F.3d at 90.  Pennsylvania courts apply the neutral principles approach.  The Presbytery of Beaver-Butler

of the United Presbyterian Church in the United States v.
Middlesex Presbyterian Church, 489 A.2d 1317, 1320-21 (Pa. 1985).
In Beaver-Butler, a local Presbyterian Church sought to secede
from the national church.  Id. at 1319.  The Pennsylvania Supreme
Court affirmed the trial court's determination that the property
in question was never explicitly held in trust for the national
church, and therefore belonged to the local church.  Id.  The
Pennsylvania Supreme Court canvassed the history of the deference
and neutral principles doctrines and determined that the latter
should apply.  Id. at 1323.

Beaver-Butler accepted that when it came to questions
about doctrine or internal church governance, Pennsylvania
courts, like all courts, must accept the determinations of the
highest church tribunals as binding fact.  Id. at 1320 (As
Justice McDermott put it, "When Caesar enters the Temple to
decide what the Temple believes, he can leave behind only his own
views.  The view of a court as to who are heretics among warring
sects is worth nothing, and must count as nothing if our
cherished diversity of religious views is to prevail.").  But the
Court recognized that "[a]ll disputes among members of a
congregation, however, are not doctrinal disputes," and when
"disputes are questions of civil law and are not predicated on

22

any religious doctrine," they are amenable to resolution in Pennsylvania's courts.  Id. at 1320-21.  Thus, Pennsylvania applies the neutral principles approach to intrachurch disputes. Moreover, Pennsylvania courts have endorsed the application of such principles outside of property disputes.  See Bear v. Reformed Mennonite Church, 341 A.2d 105, 107 (Pa. 1975) (reversing grant of motion to dismiss in case where plaintiff alleged alienation of affection and tortious interference with business relationships when church ordered its congregation, including plaintiff's wife and child, to "shun" him).

Defendants argue that we do not have subject matter jurisdiction to hear this case because of these First Amendment principles.  But First Amendment prohibitions on civil courts involving themselves in a church's doctrinal disputes do not divest a district court of subject matter jurisdiction over all claims.  Jones, 443 U.S. at 602 ("There can be little doubt about the general authority of civil courts to resolve [intrachurch property disputes, but] the First Amendment severely circumscribes the role that civil courts may play in resolving [such] disputes" (emphasis added)); but see Connor v. Archdiocese of Philadelphia, 933 A.2d 92 (Pa. Commw. Ct. 2007); Gaston v.

23

_Diocese of Allentown_, 712 A.2d 757 (Pa. Commw. Ct. 1998).[8]   The

_Watson_-_Gonzalez_-_Milivojevich_ rule applies once the record

establishes that the relevant factual disputes can only be

resolved by doctrinal determinations.   Then, the courts do not

throw up their hands and walk away, but accept the factual

_____

        [8] _Gaston_ and _Connor_ both involved the expulsion of a student
at a parochial school. _Connor_ relied specifically on _Gaston_.   In
_Gaston_, the defendants had filed a motion to dismiss for failure
to state a claim, but the trial court had dismissed the case for
lack of subject matter jurisdiction.   The Commonwealth Court
affirmed the dismissal because it required examination of "[t]he
parochial school, synonymous with the installation of dogma and
discipline in its students,...is a repository for Catholic
tradition and scripture; it is so intertwined with church
doctrine that separation is neither pragmatic or possible."
_Gaston_, 712 A.2d at 761.
        _Gaston_ and _Connor_ ought to be limited to their facts.
Claims involving expulsion from a parochial school belong to a
special class of claims.   A school's decision to expel a student
is akin to a church's decision to remove or discipline one of its
members.   The decision necessarily involves doctrinal criteria,
and attempting to disentangle the doctrinal from the secular in
this context is precisely what the _Watson_-_Gonzalez_-_Milivojevich_
rule prohibits.   In the parochial school context, unlike most
other intrachurch property dispute cases, we know from the outset
that such doctrinal questions are necessarily at the core of a
school's decision to expel.
        If a state opts for the neutral principles approach, then
the general class of intrachurch property disputes must be
amenable to resolution in civil courts under the teachings of
_Jones v. Wolf_ and _Beaver-Butler_.   Usually, we do not and cannot
know from the beginning whether the issues presented can only be
resolved with reference to religious doctrine.   It is not until
after we exercise jurisdiction and the parties develop a record -
- one which establishes that doctrinal questions underpin the
ultimate issues in the case -- that civil courts must bow out of
the controversy.

determinations of the church and try to resolve the ultimate questions underlying the _legal_ dispute with neutral principles of law.  See, e.g., Poesnecker v. Ricchio, 631 A.2d 1097 (Pa. Commw. Ct. 1993), cert. denied 514 U.S. 1079 (1995) (applying rules of religious fraternal organization to determine whether individuals had been duly elected, and deferring only to actual, valid determinations made by the organizations' authorities); Def.'s Mem. Ex. B, Shelton, No. 376 C.D. 2000 (determining when particular actions were valid church actions and accepting those actions as a factual finding).  It is only when the resolution of the ultimate legal question at issue require direct doctrinal exegesis on which no church authority has passed that courts must close their doors.  But those doors remain open until the parties have developed the issues to a sufficient degree so that it is evident that the legal rights turn upon doctrinal questions. This cannot happen here absent _some_ record.

Defendants' have moved pursuant to Rule 12(b)(1), and this obliges us to consider their arguments through a jurisdictional lens.  But we may treat a Rule 12(b)(1) motion as a Rule 12(b)(6) motion without prejudicing a plaintiff if that plaintiff responds to the motion as if it were a Rule 12(b)(6) motion.  Maio v. Aetna, Inc., 221 F.3d 472, 482 n.7 (3d Cir.

25

2000) ("a plaintiff may be prejudiced if what is, in essence, a Rule 12(b)(6) challenge to the complaint is treated as a Rule 12(b)(1) motion, but that there was no prejudice in treating district court's Rule 12(b)(1) dismissal as one predicated on Rule 12(b)(6), especially where plaintiffs treated it as such"). Although the parties tip their respective hats to the purported jurisdictional issues, their primary focus is on whether Askew has stated a claim upon which relief could be granted. Moreover, if we did not consider the parties' arguments because of a failure to file the correct motion, we would elevate form over substance, and, in the end, waste time and resources. Therefore, we treat defendants' motion as a Rule 12(b)(6) motion for the purposes of this argument only.[9]

---

[9]In reviewing a motion to dismiss for failure to state a claim, "[w]e accept all well pleaded factual allegations as true and draw all reasonable inferences from such allegations in favor of the complainant." Worldcom, Inc. v. Graphnet, Inc., 343 F.3d 651, 653 (3d Cir. 2003).

To survive a motion to dismiss, the plaintiff must "allege facts sufficient to raise a right to relief above the speculative level." Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 317 (3d Cir. Sept. 4, 2007) (citing Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)). The complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974. This requires "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." Haspel v. State Farm Mut. Auto. Ins. Co., 2007 WL 2030272 at *1 (3d Cir. Jul. 16, 2007) (unpublished) (quoting Twombly, 127 S.

Can we resolve the remaining claims with neutral principles of law or does the ultimate resolution of the issues turn on doctrinal questions?  As noted, the remaining claims are for breach of fiduciary duty to the Church (Count I), declaratory judgment that the Corporation's Articles of Incorporation are unlawful and must be amended (Count III), and unjust enrichment (Count VI).

Count III is a pure question of Pennsylvania law, and does not require us to resort to doctrine for its answer.  Askew claims that the Articles do not comply with the NCL as they must. Compl. ¶¶ 48-54.  Nothing about the Church's doctrine or internal governance bears on, or obviates the need for, determining whether the Corporation's Articles comply with the NCL.  The First Amendment does not bar the claim because we can apply neutral principles of law to resolve it.[10]

The other two remaining claims are more problematic. Both the breach of fiduciary duty and unjust enrichment claims

───────────────

Ct. at 1969).

[10]Although we have converted this portion of defendants' motion into a Rule 12(b)(6) motion, we do not reach the question of whether Askew has stated a claim that the Articles do not comply with the NCL.  Neither party has briefed the issue, and thus it would be inappropriate for us to rule on it at this time.

are based on alleged self-dealing by the natural person defendants.  The Corporation holds property in trust for the Church.  Id. Ex. B, Art. III.  Therefore, the Trustees, as the managers and directors of the Corporation, owe fiduciary duties to the Church, which is the beneficiary of the trust.  See, e.g., Bolton v. Stillwagon, 190 A.2d 105, 109 (Pa. 1963).  Self-dealing is a breach of the duty of loyalty that trustees owe to beneficiaries of the trust, and permitting those who misappropriated funds to keep them would amount to unjust enrichment to the detriment of the Church.  See id; Robbins v. Kristofic, 643 A.2d 1079, 1083 (Pa. Super. Ct. 1994).  There is well-developed Pennsylvania law that defines (a) self-dealing, (b) when such behavior violates the duty of loyalty, and (c) what steps a board must take to create a safe harbor for such transactions.  See, e.g., In re Dentler Family Trust, 873 A.2d 738 (Pa. Super. Ct. 2005) (applying neutral, objective principles capable of broad application to determine whether defendants breached their fiduciary duties through self-dealing); 15 Pa. C.S.A. § 5713 (establishing that by-laws cannot absolve directors for breach of fiduciary duty based on self-dealing); 15 Pa. C.S.A. § 5728 (establishing standard for ratifying an interested transaction in non-profit context).  Thus, based on the

Complaint's allegations, we find that at this time Askew's remaining claims are amenable to resolution through neutral principles of law.

Though it appears that at this stage of the litigation we can resolve Askew's claims through neutral principles, this may change as the record develops.  We have no evidence that the Trustees authorized any of the transactions averred, or, if authorized, in what manner.  Defendants point to no doctrinal questions that would block or call into doubt our capacity to apply the legal principles we have mentioned.

Instead, defendants contend that the First Amendment broadly proscribes _any_ consideration of the Corporation's use of funds because the underlying organization is religious in nature. This sweeps too far.  To hold that the First Amendment bars Askew's claims on this record would immunize every nonprofit corporation with a religious purpose from breach of fiduciary suits by a representative of the beneficiary class and prevent any scrutiny of questionable transactions.  It may be that the record here will eventually establish that doctrinal questions pervade, or that the trustees properly ratified the interested transactions.  It may also turn out that the First Amendment would bar the present claims.  But at this early juncture, the

29

First Amendment does not <u>now</u> bar Counts I, III, and VI.


                        BY THE COURT:

                        __\s\Stewart Dalzell